**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

**FRANKIE FULTON, DANIEL LUEVANO,
AND ALL OTHERS SIMILARLY SITUATED
UNDER 29 USC 216(B),**

    *Plaintiffs,*

      v.

**BAYOU WELL SERVICES, LLC,**

    *Defendant*.

**Civil Action No. 3:16-cv-474**

**DEFENDANT'S BRIEF IN SUPPORT OF ITS
MOTION FOR PARTIAL SUMMARY JUDGMENT**

Douglas E. Hamel, Attorney-in-Charge
State Bar No. 08818300
Vanetta L. Christ
State Bar No. 24050417
VINSON & ELKINS L.L.P.
1001 Fannin Street, Suite 2500
Houston, TX  77002-6760
Telephone: 713.758.2036
Facsimile:  713.615.5388
dhamel@velaw.com
lchrist@velaw.com

John C. Wander
State Bar No. 00791877
Margaret Terwey
State Bar No. 24087454
VINSON & ELKINS L.L.P.
Trammel Crow Center
2001 Ross Ave., Suite 3700
Dallas, TX 75201
Telephone:  214.220.7918
Facsimile:  214.999.7918
jwander@velaw.com
mterwey@velaw.com

**Attorneys for Defendant,
BAYOU WELL SERVICES, LLC**

## TABLE OF CONTENTS

**Page**

INDEX OF AUTHORITIES.................................................................................... iii

SUMMARY ...................................................................................................................1

      I.      FACTUAL BACKGROUND...................................................................2

      A.     This MSJ Pertains To The Claims Of 45 Non-Settling Plaintiffs............................2

      B.     Relevant Elements Of The Remaining Plaintiffs' Schedules And Compensation. ........................................................................................3

               1.     The Remaining Plaintiffs Worked Long Hours When On Field Rotation, And Thus BWS Established A Two Week On/Two Week Off Rotation To Ensure Adequate Recuperation. ...........................................................................3

               2.     BWS Paid The Remaining Plaintiffs At Market Hourly Rates Of Pay, Chose To Treat Both Travel Time And Non-Revenue Time As Hours Worked, And Structured Its Workweeks To Fully Recognize Overtime Worked By The Remaining Plaintiffs. ...........................................................7

               3.     BWS Also Paid The Remaining Plaintiffs Quarterly Team Incentive Plan Bonuses, And Beginning With The Fourth Quarter Of 2013 Paid The Remaining Plaintiffs Overtime Associated With The Quarterly Team Incentive Plan Bonuses. ..............................................................................11

      C.     The Remaining Plaintiffs Were Well-Compensated And Had No Complaints About Their Pay. ......................................................14

    II.    ARGUMENT.........................................................................................15

      A.     The Legal Framework Of "Regular Pay." ............................................15

      B.     "Non-Revenue Pay" Paid For An Unscheduled Workweek Should Not Be Reallocated To A Different Workweek For The Regular Rate Calculation...............................................................................16

               1.     The FLSA Operates On A Workweek Basis, And Pay Received For One Workweek Does Not Affect The Regular Rate In A Different Workweek.................................................16

                     a.     Overtime Is A Weekly Calculation...............................16

b. Non-Revenue Pay Should Not Be Artificially Allocated To Scheduled Workweeks. .............................................18

c. BWS And The Remaining Plaintiffs Reasonably Agreed to Treat Unscheduled Non-Revenue Pay As Hours Worked. ...............................................................21

2. In The Alternative, Section 7(e)(2) Establishes That Non-Revenue Pay Should Not Affect The Regular Rate. ..................................22

3. Summary ........................................................................23

C. BWS Amended Its Pay Practices And Properly Paid Overtime Associated With The TIP Bonuses. ........................................................25

1. BWS Was Entitled To Change Its Bonus Plan. .........................................25

2. BWS Paid Overtime Associated With The TIP Bonuses. .........................28

3. The Overtime BWS Paid In Connection With The Bonuses Was Calculated Properly. ............................................................30

D. No Evidence Supports The Vague "Travel Time" Claims. ...................................31

E. Alternatively, The Claims Of A Number Of Remaining Plaintiffs Are Indisputably Time-Barred. ................................................................32

III. CONCLUSION ....................................................................................32

CERTIFICATE OF SERVICE ........................................................................34

# INDEX OF AUTHORITIES

<u>**Cases**</u>

*Abshire v. Redland Energy Services, LLC*,
  695 F.3d 792 (8th Cir. 2012) ................................................................................... 28

*Alvarez v. IBP Inc.*,
  546 U.S. 21 (2005) .................................................................................................... 18

*Armour & Co. v. Wantock*,
  323 U.S. 126 (1944) .................................................................................................. 18

*Ballaris v. Wacker Siltronic Corp.*,
  370 F.3d 901(9th Cir. 2004) ..................................................................................... 23

*Bendalin v. Delgado*,
  406 S.W.2d 897 (Tex. 1966) ..................................................................................... 26

*Brunozzi v. Cable Communs., Inc.*,
  851 F.3d 990 (9th Cir. 2017) .................................................................................... 30

*Cellular One, Inc. v. Boyd*,
  653 So.2d 30 (La. Ct. App. 1995) ............................................................................. 26

*Christensen v. Harris County*,
  529 U.S. 576 (2000) .................................................................................................. 28

*Connor v. Celanese, Ltd.*,
  428 F. Supp. 2d 628 (S.D. Tex. 2006) ..................................................................... 29

*Crespo v. County of Monroe, New York*,
  No. 10-CV-6590L, 2015 WL 2406112 (W.D.N.Y. May 20, 2015) ......................... 17

*Duplesse v. County of Los Angeles*,
  17 F. Supp. 2d 1045 (C.D. Cal. 2010) ..................................................................... 31

*Featsent v. City of Youngstown*,
  70 F.3d 900 (6th Cir. 1995) ...................................................................................... 23

*Gagnon v. United Technisource, Inc.*,
  607 F.3d 1036 (5th Cir. 2010) .................................................................................. 20

*Goulas v. LaGreca*,
  Civ. Act. No. 12-898, 2013 WL 2477030 (E.D. La. June 7, 2013) ......................... 19

*Hathaway v. Gen. Mills, Inc.*,
  711 S.W.2d 227 (Tex. 1986) ..................................................................................... 26

*Herman v. Fabri-Centers of Am.*,
  308 F.3d 580 (6th Cir. 2002) .................................................................................... 16

*Lucht's Concrete Pumping, Inc. v. Horner*,
  255 P.3d 1058 (Colo. 2011) ..................................................................................... 26

*McCormick v. Cable Communs., Inc.*,
  2015 U.S. Dist. LEXIS 89133 (D. Or. July 9, 2015) ............................................... 30

*Minizza v. Stone Container Corp.*,
  842 F.2d 1456 (3d Cir. 1988) ................................................................................... 23

*Parth v. Pomona Valley Hospital Medical Cntr.*,
  630 F.3d 794 (9th Cir. 2010) .................................................................................... 29

*Piquniq Mgmt. Corp. v. Reeves*,
  965 P.2d 732 (1998) .................................................................................................. 17

*Plumley v. So. Container, Inc.*,
    303 F.3d 364 (1st Cir. 2002) ............................................................................ 22
*Reich v. Interstate Brands Corp.*,
    57 F.3d 574 (7th Cir. 1995) .............................................................................. 23
*Sandel v. Fairfield Industries*,
    C.A. No. 4:13-CV-1596, 2015 WL 7709583 (S.D. Tex. June 25, 2015) ............... 19
*Shepard v. City of Waterloo*,
    14-CV-2057-LRR, 2015 WL 9165915(N.D. Iowa Dec. 16, 2015) ......................... 23
*Solano v. A Navas Party Production, Inc.*,
    2011 WL 98819(S.D. Fla. January 12, 2011) ...................................................... 16
*St. Amant v. Knights' Marine and Indus. Services*,
    No. 14-174, 2015 WL 4568813 (S.D. Miss. July 28, 2015)................................... 20
*Vasquez v. TWC Admin, LLC*,
    2015 WL 2084486(C.D. Cal. May 4, 2015) ........................................................ 31
*Walling v. A.H. Belo Corp.*,
    316 U.S. 624 (1942).................................................................................. 24, 29
*Wheeler v. Hampton Township*,
    399 F.3d 238 (3d Cir. 2005)............................................................................. 23


**Statutes**

29 C.F.R. § 778.104 ........................................................................................... 16
29 C.F.R. § 778.109 ............................................................................... 15, 17, 31
29 C.F.R. § 778.209(a).................................................................................. 29, 30
29 C.F.R. § 778.320 ........................................................................................... 21
29 C.F.R. § 778.500 ........................................................................................... 19
29 C.F.R. § 778.500(a)........................................................................................ 19
29 C.F.R. § 790.11 ............................................................................................. 28
29 U.S.C. § 207(a) ...................................................................................... 15, 16
29 U.S.C. § 207(a)(2).......................................................................................... 15
29 U.S.C. § 207(e) ...................................................................................... 15, 22
29 U.S.C.A. § 255(a) .......................................................................................... 32
DLSE Manual § 48.1.3.1 ..................................................................................... 16
Fair Labor Standards Act ...................................................................................... 1


**Other Authorities**

2008 WL 4906278, September 22, 2008 DOL Wage and Hour Opinion Letter ........... 17

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| **FRANKIE FULTON, DANIEL LUEVANO,** **AND ALL OTHERS SIMILARLY SITUATED** **UNDER 29 USC 216(B),** *Plaintiffs,* v. **BAYOU WELL SERVICES, LLC,** *Defendant*. | **Civil Action No. 3:16-cv-474** |

**DEFENDANT'S BRIEF IN SUPPORT OF ITS**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendant Bayou Well Services, LLC ("Defendant" or "BWS"), files this Brief in

Support of Its Motion for Partial Summary Judgment ("MSJ"),1 as follows.

**SUMMARY**

Unlike many Fair Labor Standards Act ("FLSA") cases, this lawsuit does not involve

fact-intensive arguments over misclassification or off-the-clock work. The disputes here

principally involve legal interpretations regarding the calculation of the regular rate upon which

overtime is calculated, more specifically:

- May an employer advance its legitimate business interests in having well-rested employees and avoiding competitive activity by paying those employees for forty hours at their hourly rates during their workweeks they are not scheduled without being required to artificially add this pay to regular rate calculations for scheduled workweeks?

---

1 **Although this motion is for Partial Summary Judgment, if granted it will dispose of all claims except for overtime claims asserted by ten plaintiffs involving quarterly bonuses paid during the period February 19, 2013 through October 17, 2013, claims that are viable only if a three-year statute of limitations applies. As a practical matter, if granted, this motion will leave very little for further resolution by this Court.**

- May an employer awarding a quarterly bonus take into account the total incentive payout to be paid each individual (including overtime associated with the bonus) when awarding such bonuses?

As set forth herein, the answer to both questions is "Yes."[2]  Bayou further contends that certain of the Remaining Plaintiffs' claims are time-barred and should be dismissed.

## I.   FACTUAL BACKGROUND

### A.   This MSJ Pertains To The Claims Of 45 Non-Settling Plaintiffs.

This Court conditionally certified a collective of BWS's "current and former hourly-paid employees who received non-discretionary bonus or 'non-revenue' pay during the past three years." Dkt. 45 at p. 7. 162 persons opted in to the collective.[3]  *See* Dkt. 1, 6, 8, 14-18, 23, 25, 26, 32, 34, 35, 38, 39, 42-44, 46, 47, 49-59, 62, 65.  However, 117 plaintiffs from the collective have **settled all their claims against** BWS.  Ex. A (Declaration of Douglas Hamel) ("Hamel Dec."), App. 2, at ¶2.  Thus, the MSJ focuses exclusively on those 45[4] plaintiffs/opt-ins who are not covered[5] by that settlement agreement (the "Remaining Plaintiffs," listed on Exhibit 2 to the Hamel Dec, App. 15).

The Remaining Plaintiffs' claims assert that BWS did not properly compile their regular rate of pay for calculation of overtime pay.

All Remaining Plaintiffs were at-will employees who worked exclusively during their BWS employment in its Pressure Pumping (hydraulic fracturing) business.  *See* Ex. B (Clark

---

2 These answers dispose of 35 Remaining Plaintiffs' claims completely.  Ten Remaining Plaintiffs may have claims related to the bonuses paid that survive the MSJ, but only if a three year statute of limitation applies.

3 This number does not include persons who have withdrawn consents.

4 Of the "Remaining Plaintiffs," 6 signed their opt-in forms more than three years after departing hourly-paid positions at BWS.  *See* Ex. B (Declaration of Renita Clark) ("Clark Dec."), App. 18, at ¶4-5.  This additional independent ground for summary judgment is addressed within this Brief.

5 The claims of 5 Remaining Plaintiffs who changed positions during their BWS employment have been resolved only in part by the settlement agreement.  *See* Ex. A (Hamel Dec.), App. 2, at ¶4; Ex. B (Clark Dec.), App. 17, at ¶4. These 5 Remaining Plaintiffs are included in the total of 45.  Ex. A (Hamel Dec."), App. 2, at ¶4.

Dec.), App. 17, at ¶3; *see also* Ex. C (Excerpts of Deposition of Frankie Fulton)("Fulton Dep."), App. 24, at 20:2-15 (stating he understood he was employed at will); Ex. D (Excerpts of Deposition of Daniel Luevano) ("Luevano Dep."), App. 53, at 25:3-26:9 (agreeing he signed acknowledgement of at-will employment and that he was never told he was not at-will); Ex. E (Excerpts of Deposition of Kaleb Baugh) ("Baugh Dep."), App. 69, at 19:18-20:7 (agreeing that he knew what at-will employment was and that he was an at-will employee of BWS); Ex. F (Excerpts of Deposition of Raul Hazelhurst) ("Hazelhurst Dep."), App. 95, at 19:4-18 (acknowledging that he understood that BWS could terminate him at any time and that he could quit at any time); Ex. G (Excerpts of Deposition of Carlos Castillo) ("Castillo Dep."), App. 123, at 34:5-15 (agreeing that he could be fired or quit at any time).   Additionally, all held non-exempt "field" positions, which involved working at customer job sites, at some point during the three years prior to their individual Opt-In dates.[6]  Ex. B (Clark Dec.), App. 17, at ¶3-4.

## B.  Relevant Elements[7] Of The Remaining Plaintiffs' Schedules And Compensation.

### 1.  The Remaining Plaintiffs Worked Long Hours When On Field Rotation, And Thus BWS Established A Two Week On/Two Week Off Rotation To Ensure Adequate Recuperation.

BWS's pressure pumping field employees were organized into field crews that worked at customer job sites; the employees assigned to each crew remained consistent from rotation to rotation.  Ex. H (Declaration of Goldie Afshar) ("Afshar Dec."), App. 136, at ¶2.  The field

---

[6] The five Remaining Plaintiffs who held "shop" positions (which meant they worked in administration or repairing equipment at an assigned location that did not vary) at some point during the three years prior to their individual Opt-In dates have settled their claims related to their "shop" employment   *See* Ex. A (Hamel Dec.), App. 2, at ¶4; Ex. B (Clark Dec.), App. 17, at ¶4.

[7] In their current live pleading, the Second Amended Complaint ("Complaint"), Plaintiffs allege that BWS "fail[ed] to include all required remuneration, including non-discretionary bonuses and 'Non Revenue' pay [] into their regular rate of pay when calculating and paying Plaintiffs' and the Class Members' overtime compensation." Doc. 22 at ¶1.  Therefore, this background focuses on Plaintiffs' base hourly wages, bonuses, and non-revenue pay, as opposed to other elements of compensation (such as fringe benefits) which are not the subject of this litigation.

crews did not work a "typical" 9-to-5, Monday to Friday schedule. Rather, they were assigned to two-week field rotations, and then were unassigned for two weeks. *Id*. at ¶3. The job sites for locations of the field rotations varied and were often remote. *Id*. at ¶2. Typically, a BWS field employee going on rotation would travel from his home by car or plane to lodging convenient to the job sites, where his crew would be housed. *Id*. at ¶4. Each day of an employee's 14-day field rotation he would travel with his crew from the lodging, usually by crew van, to the job site and then work a 12-hour shift. *Id*. at ¶4. With travel time to and from the job site, work days were often 15 hours total, or approximately 105 hours per week. *See*, *e.g*., Ex. D (Luevano Dep.), App. 59, at 36:1-3 (agreeing that he often was paid for 15 hours in a day because he would work 12 hours and travel another 3). Thus, the Remaining Plaintiffs worked at least 12 hours per day, and more often worked 15 hours per day, for 14 consecutive days before returning home.

BWS created the two-week-on, two-week-off rotation schedule deliberately based on the experience of its president and co-founder, Brett Agee ("Agee"), as well as others on the initial management team. Ex. I (Brett Agee 30(b)(6) Deposition) ("Agee Dep."), App. 148-149, at 52:15-53:1. Agee testified that he had "worked myself in a prior life under that sort of a rotational schedule…and I was able to see the value in it." *Id*., App. 144-145, at 43:20-44:3. He explained of the long days that the field crews worked that "I've done that before, and you can do that for a period of time, but the longer you do it without being able to recharge and refresh, the more taxing the system is." *Id*., App. 147, at 51:3-23. Moreover, when BWS was developing its pressure pumping business line, its potential customer had shared issues about its other service providers, including "the general idea of people showing up on their location not being able to go ahead and perform work because they felt like they weren't rested and they were

completely strung out." *Id*., App. 157-158, at 170:13-171:9.   The Remaining Plaintiffs agreed that BWS's rotational schedule was important to them.   *See* Ex. C (Fulton Dep.), App. 35, at 41:1-6 (stating that he never looked for other employment while at BWS because the two weeks off were important to him); Ex. D (Luevano Dep.), App. 52, at 22:5-9 (stating that BWS's two weeks on, two weeks off schedule was why he thought BWS could be a place he would like to work); Ex. E (Baugh Dep.), App. 67, at 12:5-9 (stating that he applied at BWS because the days off were attractive); Ex. F (Hazelhurst Dep.), App. 90-91, at 13:18-14:2 (stating that the thing that most interested him in applying to BWS was the paid two weeks off).

Consistent with the idea that the two week on, two week off rotation was to ensure that the field crews were "recharged," when a Remaining Plaintiff was off rotation he was not permitted to work for a competitor, and performing any work during that time was frowned upon.   Ex. C, (Fulton Dep.), App. 30, at 30:7-10 (agreeing that while he worked for BWS he could not work for competitor); Ex. G (Castillo Dep.), App. 124-125, at 36:22-37:4 (agreeing he could not work for competitor, including during off weeks); Ex. I (Agee Dep.), App. 152, at 74:3-21 (explaining that BWS frowned on working during the two-week off rotation period). Occasionally, BWS solicited volunteers to work off rotation or conducted training during off weeks, but generally it expected its field employees to rest when off rotation given their grueling schedules and safety-sensitive positions when in the field.   *See* Ex. D (Luevano Dep.), App. 55, at 27:2-24 (agreeing that pressure pumping is dangerous and that it is important for field employees to be rested and alert); Ex. E (Baugh Dep.), App. 73, at 28:3-12 (agreeing that it was important for employees to have adequate rest to work safely) and App. 74, 29:17-21 (agreeing that BWS's schedule "allowed them plenty of time off to rest and recuperate"); Ex. C (Fulton Dep.), App. 26-27, at 22:21-23:16 (agreeing that pressure pumping can be very dangerous and

that it's important to be on "top of your game" in terms of safety and focus); Ex. F (Hazelhurst

Dep.), App. 92, at 16:4-22 (describing hydraulic fracturing and agreeing that having enough rest

and focus is a safety issue), App. 93, 17:5-19 (agreeing that BWS was doing something different

from the other oilfield service companies in terms of ensuring employees got enough rest), App.

99, 26:2-13 (describing BWS's expectation as "their time off was just go home, be with your

family, relax, be ready to come back to work when it's time to come back to work") and App.

107-108, 44:23-45:8 (agreeing during weeks off he was not supposed to moonlight for a

competitor and that he was supposed to "either recuperate so that you were in good shape or to

participate in safety training that would help keep the job site safe"); Ex. G (Castillo Dep.), App.

121, at 31:14-17 (agreeing important part of safety is ensuring employees are well-rested) and

App. 122, 32:2-19 (agreeing that BWS's schedule offered the opportunity to rest while off to

prepare for duty); Ex. I (Agee Dep.) App. 155, at 91:13-19 (stating that refresher training was

held to coincide with employees' "rolling on rotation or off rotation") and App. 153-154, 87:21-

88:25 (stating that employees occasionally worked holdover days).   This is implicit in its offer

letters to the Remaining Plaintiffs.  *See* Ex. J(Fulton Offer Letter), App. 164 (identified at Ex. C,

(Fulton Dep.), App. 25, p. 21:12-16); Ex. K (Baugh Offer Letter), App. 166 (identified at Ex. E,

(Baugh Dep.), App. 69, p. 19:15-21); Ex. L (Hazelhurst Offer Letter), App. 168 (identified at Ex.

F, Hazelhurst Dep.), App. 96, p. 22:14-19); Ex. M (Castillo Offer Letter), App. 170 (identified at

Castillo Dep., App. 117, p. 25:20-24); Ex. N (Luevano Offer Letter), App. 172 (identified at

Luevano Dep., App. 56-57, p. 28:20-29:8) ("Two Weeks on and Two Weeks off work rotation,

**work six months a year**.  12 hours on and 12 hours off work schedule, **take the time to rest**.").

  **2.**  **BWS Paid The Remaining Plaintiffs At Market Hourly Rates Of Pay, Chose To Treat Both Travel Time And Non-Revenue Time As Hours Worked, And Structured Its Workweeks To Fully Recognize Overtime Worked By The Remaining Plaintiffs.**

BWS hired each of the Remaining Plaintiffs at an hourly rate of pay, typically at or above the hourly rate his prior employer paid him.  *See* Ex. H (Afshar Dec.), App. 137, at ¶6.  As some examples:

- Plaintiff Frankie Fulton ("Fulton") was making $18.50/hour at Schlumberger, but started at $23.00/hour at BWS.
- Plaintiff Kaleb Baugh ("Baugh") was making $17.55/hour at Schlumberger, but his initial pay at BWS was $20.00/hour.
- Plaintiff Luevano was earning $20/hour at Universal Well Services, but started at $23.00/hour at BWS.
- Plaintiff Hazelhurst was earning $22/hour at Halliburton, and started at $22/hour at BWS.
- Plaintiff Castillo was earning $22.50/hour at Pumpco, and started at $23/hour at BWS.

Ex. C (Fulton Dep.), App. 24, 31, at 20:16-21, 34:8-13); Ex. D (Luevano Dep.) App. 50-51, 56-57, at 16:24-17:4, 28:20-29:11; Ex. E (Baugh Dep.), App. 68, 71, at 14:8-18, 21:10-14; Ex. F (Hazelhurst Dep.), App. 94, 97, at 18:23-25, 23:9-13; Ex. G (Castillo Dep.), App. 116, 118-119, at 19:9-10, 28:16-29:9; *see also* Ex. I, (Agee Dep.), App. 141-142, at 33:14-34:12 (stating that to be competitive "we addressed the pay portion on an hourly basis by making sure that more time than not we…didn't pay a market or industry standard; we typically were above that on an hourly basis") and App. 143, at 37:3-15 (stating that BWS typically paid more than other competitors by less than five dollars an hour, but that was "meaningful when you were working the number of hours that we were being tasked with").  Plaintiff Frankie Fulton did not dispute that his hourly rate was market rate for someone with his experience "within a few dollars," and agreed that his rate was "fair compensation for the—for the position."  Ex. C (Fulton Dep.), App. 32, at 35:3-18.

Hours worked by the Remaining Plaintiffs, including travel time to and from lodging to job site, were paid at the hourly rate for the first 40 hours and at 1½ times the hourly rate for hours worked in excess of 40 in each work week. Ex. H (Afshar Dec.), App. 137, at ¶7. Notably, BWS aligned the rotation schedule to its statutory work week (as opposed to spreading the rotation over two statutory workweeks), which had the practical effect of maximizing overtime hours during rotational weeks.[8]  *Id.* at ¶7; Ex. D (Luevano Dep.), App. 60, at 42:8-14 (agreeing that BWS did not spread the hours he worked across multiple workweeks); Ex. E (Baugh Dep.), App. 77-78, at 33:16-34:20 (agreeing that BWS did not appear to be minimizing overtime paid, because it didn't spread pay across workweeks); Ex. C (Fulton Dep.), App. 21-23, at 14:24-16:7 (noting that unlike BWS one of his subsequent employers, Stingray, had different scheduled weeks and pay weeks, which resulted in less overtime being due); Ex. F (Hazelhurst Dep.), App. 88-89, at 11:17-12:18 (testifying that his post-BWS employer moved around the workweek which resulted in his receiving less overtime pay, unlike BWS); Ex. G (Castillo Dep.), App. 112-113, at 10:17-11:16 (acknowledging that his current employer structures a two-week rotation over three workweeks which results in minimizing overtime, and agreeing that in contrast BWS had the pay and work week start on the same day).  In addition, BWS had a practice of treating their travel time from the hotel to field location as hours worked, despite not being legally obligated to do so.  *See* Ex. H (Afshar Dec.), App. 136, at ¶4; Ex. D (Luevano Dep.), App. 58, at 35:2-4 (acknowledging that when he traveled he was paid at regular hourly

---

8 "[N]umerous federal and state courts have concluded that an employer does not violate the FLSA merely because, under a consistently-designated workweek, its employees earn fewer hours of overtime than they would if the workweek was more favorably aligned with their work schedules." *Abshire v. Redland Energy Services, LLC*, 695 F.3d 792 (8th Cir. 2012).  For example, an employer may establish the workweek as beginning at 12:01 AM Thursday and ending 168 hours later.  An employee scheduled to commence a rotation of seven 15-hour days at 6:00 AM Monday would then work 45 hours in Week 1 and 60 hours in Week 2, thus receiving 80 hours at straight time and only 25 hours of overtime pay.  Conversely, BWS's assignment of workweek and rotation schedules provided Plaintiffs working 105 hours during their first week of rotation with 40 hours straight time and 65 hours of overtime pay.

rate), Ex. E (Baugh Dep.), App. 79, at 35:12-23 (agreeing that he was paid regular hourly rate of

pay for travel time), App. 80, at 36:5-9 (agreeing that if travel time was in excess of 40 hours in a

workweek he was paid at time and one-half his regular hourly rate); Ex. C (Fulton Dep.), App.

39, 46:15-18 (agreeing that he was paid for travel time over 40 hours/week at his overtime rate);

Ex. F (Hazelhurst Dep.), App. 102, at 33:3-17 (agreeing that he was paid for travel time from the

hotel at his hourly base rate and that if he was "on overtime" he would receive time and one-half

pay for such travel time); Ex. G (Castillo Dep.), App. 126-127, at 39:7-22, 40:4-11 (agreeing he

was paid for travel to and from the motel to the job site at the same rate he got for actually

working at the site), App. 131, at 48:8-22 (agreeing he was paid overtime for hours worked in

excess of 40, including travel hours).

The Remaining Plaintiffs, when in field positions, also were paid forty hours of pay at

their hourly rates ("non-revenue pay") during their off-rotation workweeks.  Ex. H (Afshar

Dec.), App. 137, at ¶8;.; Ex. D (Luevano Dep.), App. 61, at 44:1-4; Ex. G (Castillo Dep.), App.

127, at 40:18-22 (agreeing he received 40 hours of pay at his regular hourly rate during off

weeks).  Agee explained that "we chose to pay them to not work and to sleep, essentially" in

order "to make sure that we had a very well-rested group of people" so that they could "be as

good as we possibly could be while we were at work."  Ex. I (Agee  Dep.), App. 146-148, at

50:7-51:12, 51:13-52:14.  He continued:

> it was one of the foundational pieces of this, and that—and the reason is because for the
> two weeks while those employees were on, they were being paid to go ahead and work
> and work hard, daily, nightly, sun-up, sundown.  The whole—it was a very mental and
> physically taxing exercise.  And so the important part when they were off was for us to
> go ahead and pay them to truly be off.  We paid them to go to sleep, to rest and get ready
> to come back to work and be able to do it all over again.
>
> And the other thing is that those two weeks off, that's a lot of idle time, and when people
> are idle, they begin to go ahead and start entertaining unpure thoughts, like, well, maybe I
> could go ahead and catch another job….And at that point in time there are a lot of
> mercenary-type crews and companies that were willing to go ahead and take people on a

one-off or two-off or whole-crew basis to be able to catch jobs and perform work regardless of whether or not they were a company's full-time employees.

*Id*., App. 150-151, at 60:9-61:16.   *See also* Ex. F (Hazelhurst Dep.), App. 98-99, 25:20-26:1 (agreeing that BWS paid him during off weeks "so that you wouldn't compete and that you would recuperate"); Ex. E (Baugh Dep.), App. 76, at 31:2-11 (agreeing that being paid during his two weeks off made it easier not to look for other work during those two weeks off).

The forty hours of non-revenue pay paid for unscheduled weeks did not vary based on the amount of work the Remaining Plaintiffs performed during their scheduled workweeks.  Ex. H (Afshar Dec.), App. 137, at ¶8; Ex. E (Baugh Dep.), App. 82, at 44:1-13 (agreeing that regardless of the number of hours he worked during scheduled time, he received 40 hours of pay for unscheduled workweeks); Ex. C (Fulton Dep.), App. 45-46, at 58:15-59:3 (agreeing that regardless of the number of hours he worked during a week in the field, he received the same number of hours of pay for unscheduled workweeks).  Moreover, consistent with treating non-revenue hours as hours worked, if a Remaining Opt-In actually worked in the field during his unscheduled workweek he was paid for his working hours at time and a half (in addition to his non-revenue hours).  Ex. H (Afshar Dec.), App. 137, at ¶8; Ex. F (Hazelhurst Dep.), App. 105, at 41:17-23 (agreeing that if he worked while he was on non-revenue time he was paid at time and a half, indicating he was compensated as if he worked the non-revenue time); Ex. G (Castillo Dep.), App. 130, at 47:16-20 (agreeing that when he worked during an off week he was paid an additional time and a half for hours worked).

**3.     BWS Also Paid The Remaining Plaintiffs Quarterly Team Incentive Plan Bonuses, And Beginning With The Fourth Quarter Of 2013[9] Paid The Remaining Plaintiffs Overtime Associated With The Quarterly Team Incentive Plan Bonuses.**

All of the Remaining Plaintiffs also were eligible for BWS's Team Incentive Plan ("TIP"). Ex. H (Afshar Dec.), App. 137, at ¶10. The TIP provided a quarterly incentive to be paid at the discretion of BWS management for achievement of client expectations related to safety, environment, and operational efficiency. *Id*. at ¶10. BWS wanted the TIP to incentivize team (as opposed to individual) achievements; thus, in administering it BWS wanted to treat members of the same crew identically, so their objectives would be aligned. *Id*., App. 138, at ¶13. While the Plaintiffs' offer letters made reference to TIP eligibility, they did not identify a specific bonus target amount. *See* Ex. J-N, App. 163-172 (Offer Letters) (each stating "you will be eligible to participate in the Team Incentive Plan. This plan provides an incentive for achieving the client's documented expectations of Safety, and Environmental and Operational Efficiency. You must be employed at the time of payment in order to receive any bonus monies"). Plaintiffs generally concede that they were not promised a specific amount to join BWS and that BWS could decide not to pay a bonus at all. Ex. C (Fulton Dep.), App. 28, at 26:11-20 (admitting that he did not know anything about the TIP prior to his offer, and that the offer letter was the first he had heard about TIP), App. 33 at 39:5-7 (stating that he did not recall discussing the TIP when negotiating the terms of his employment), I*d.* at 39:18-21 (admitting that he did not recall if he was told the TIP was guaranteed), and App. 34, at 40:2-6 (stating that he never asked to see a copy of the TIP and that he cannot remember ever seeing it); Ex. G (Castillo Dep.), App. 120, at 30:14-19 (stating that the only conversations he had about the TIP

---

9 A significant date because all Remaining Plaintiffs have no claims to prior bonuses under a two year statute of limitations and only ten may have prior bonus claims of a three year statute of limitations applies.

were with co-workers) and App. 114-115, at 17:24-18:14 (agreeing that he understood that the quarterly bonus was not guaranteed and that BWS could determine not to pay a bonus).

In the amended TIP version dated November 12, 2013,[10] the plan states in part:

| 3.02 | | |
| Levels of award: | | |
| | | |
| RPT: | 85% | 90% |
| Environmental Release: | Zero | Zero |
| Injuries: | Zero | Zero |
| | | |
| **Target Incentive, including overtime:** | **$0 - $3,000** | **$0 - $6,000** |

\* The amount to be paid will include the bonus and the overtime attributable to that bonus amount.

Ex. O (Team Incentive Plan 3.0), App. 174 identified at Ex. I (Agee Dep.), App. 156, at 155:3-6. While this amended TIP plan document was not circulated amongst the Remaining Plaintiffs, BWS presented information regarding this change to its field employees (including the Remaining Plaintiffs) in the fall of 2013.  Ex. H (Afshar Dec.), App. 137, at ¶10.  Consistent with the statement that "an additional payment for overtime attributable to the bonus will also be paid," when the TIP bonus payment was made for the fourth quarter of 2013 and all later quarters, the Remaining Plaintiffs received clear notice in pay checks that set forth separately the bonus awarded and the overtime payment attributable to that bonus payment.  For example, for the fourth quarter of 2013,[11]: Plaintiff Fulton's TIP check stub recorded:

---

10 Through the first quarter of 2013, TIP bonuses were paid in a single line item to the Remaining Plaintiffs described as "Bonus."  Ex. H (Afshar Dec.), App. 138, at ¶12.  In the payments for the second and third quarter of 2013, payments made to the Remaining Plaintiffs were described as "bonus overtime" in their payroll data.  *Id.* at ¶12.

11 Named Plaintiff Luevano terminated employment in June 2013.  Ex. B (Clark Dec.), App. 18, at ¶6.  Thus, he would not have received a fourth quarter 2013 bonus payment..

| Earnings | rate | hours | this period | year to date |
|---|---|---|---|---|
| Bonus | | | 5,099.21 | 5,099.21 |
| Bonusovertime | | | 900.80 | 900.80 |
| Er Paid Life | | | | 6.11 |
| Non Revenue | | | | 1,880.00 |
| **Gross Pay** | | | **$6,000.01** | 7,886.12 |

Ex. P (Fulton Check Stub), App. 176, identified at Ex. C (Fulton Dep.), App. 42-43, at 52:13-21, 53:4-8.  And Plaintiff Baugh's TIP check stub recorded:

| Earnings | rate | hours | this period | year to date |
|---|---|---|---|---|
| Bonus | | | 3,380.38 | 3,380.38 |
| Bonusovertime | | | 619.70 | 619.70 |
| Regular | | | | 880.00 |
| Overtime | | | | 2,805.00 |
| Er Paid Life | | | | 5.72 |
| Non Revenue | | | | 880.00 |
| **Gross Pay** | | | **$4,000.08** | 8,570.80 |

Ex. Q (Baugh Check Stub), App. 180, identified at Ex. E (Baugh Dep.), App. 83, at 45:1-8; *see also* Ex. G (Castillo Dep.), App. 133, at 52:7-16 (acknowledging that for his 5/31/15 bonus he received $5133.20, plus $866.80 in associated overtime, and did not complain about this).

Each crew members typically received the same total payout (bonus plus overtime) as each other for each quarter, and BWS structured the bonus awards deliberately to achieve this result.  Ex. H (Afshar Dec.), App. 138, at ¶13.  Remaining Plaintiffs fully understood the TIP was so structured.  Ex. C (Fulton Dep.), App. 29, at 29:5-8 ("whole idea of the program was that by crew, the crew members would—would be paid the same thing in a payout"); App. 44, at 54:2-5 (stating that he understood everyone on the same crew was to receive the same total amount); Ex. D (Luevano Dep.), App. 62-63, at 47:23-48:1 ("I understood that payment from [TIP] was supposed to be on a team basis so everyone got the same thing"); Ex. E (Baugh Dep.), App. 72, at 26:2-6 (everyone on the team was to get the same amount of payout); Ex. F (Hazelhurst Dep.), App. 101, at 30:15-24 (agreeing that everyone on his crew was to get the

13

same amount of payout from TIP based on the team effort); Ex. G (Castillo Dep.), App. 132, at 50:3-11 (agreeing that everyone on the team would receive the same payout because the payout was for team not individual effort).  The bonus amount BWS chose to award was influenced by the total bonus-related payout to be made.  Ex. I (Agee Dep.), App. 161, at 197:4-16.  The regular rate increase for purposes of calculating the overtime payment was equal to the quarterly bonus payment divided by the number of hours worked/paid in the quarter (including non-revenue time).  Ex. H (Afshar Dec.), App. 137, at ¶11; Ex. I (Agee Dep.), App. 159-160, at 181:16-182:3.  This TIP pay practice continued until the Pressure Pumping unit shut down on May 31, 2015.  Ex. H (Afshar Dec.), App. 137, at ¶10.

C.     **The Remaining Plaintiffs Were Well-Compensated And Had No Complaints About Their Pay.**

The above-described pay practices resulted in the Remaining Plaintiffs being well-compensated:  for example, in 2014 (the only full calendar year at issue in this lawsuit given the statute of limitations and the cessation of operations in May 2015) Plaintiff Fulton was paid at least $134,000 in 2014, Plaintiff Baugh earned $123,559.36, Plaintiff Castillo was paid at least $135,998.28, and Plaintiff Hazelhurst was paid at least $135,284.91.  Ex. C (Fulton Dep.), App. 40-41, at 49:23-50:6; Ex. E (Baugh Dep.), App. 81, at 39:9-15; Ex. G (Castillo Dep.), App. 129, at 44:3-13; Ex. F (Hazelhurst Dep.), App. 103-104, at 37:19-38:6.  For most, perhaps not all, of the Remaining Plaintiffs, these six-figure numbers were the most they had ever earned annually.  Ex. C (Fulton Dep.), App. 40-41, at 49:23-50:6; Ex. E (Baugh Dep.), App. 81, at 39:6-8 (admitting that prior to his employment at BWS he had never earned more than $100,000 in a year); Ex. F (Hazelhurst Dep.), App. 104, at 38:4-11 (acknowledging that he had never made as much money as he made at BWS).  The Remaining Plaintiffs agreed that apart from any minor discrepancies which were addressed, they never complained to BWS that they felt that they were

improperly compensated.   Ex. C (Fulton Dep.), App. 36-37, at 42:20-43:21 (stating that he checked his pay stubs regularly and that any minor discrepancy he brought to BWS's attention was addressed) and App. 38, at 44:7-11 (stating that he never had a situation where he thought his TIP payment was incorrect); Ex. F (Hazelhurst Dep.), App. 100, at 28:6-20 (agreeing that he knew how to raise issues to BWS but never did so, apart from his need for personal time off, and that he never thought he was paid incorrectly) and App. 106, at 43:12-18 (agreeing that he didn't complain about his TIP bonus payments); Ex. G (Castillo Dep.), App. 128, at 41:4-25 (agreeing that he knew how to raise pay issues, but never complained about his pay, number of hours, or TIP bonus being incorrect).

## II.      ARGUMENT

### A.      The Legal Framework Of "Regular Pay."

This dispute centers on the legal issue of whether and/or how non-revenue pay and the TIP bonuses paid to the Remaining Plaintiffs should be included in the regular rate of pay.  The FLSA prohibits an employer from employing an employee "for a workweek longer than forty hours…unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."   29 U.S.C. § 207(a)(2).   In turn, the "regular rate" is defined to include "all remuneration for employment" with certain exclusions.  29 U.S.C. § 207(e).  While the Act does not set forth the method for calculation of the "regular rate," in its interpretive guidance the Department of Labor has explained that the "regular hourly rate of pay of an employee is determined by dividing his total remuneration for employment (except statutory exclusions) in any **workweek** by the total number of hours actually worked by him in that **workweek** for which such compensation was paid."  29 C.F.R. § 778.109 (emphasis added).

**B.      "Non-Revenue Pay" Paid For An Unscheduled Workweek Should Not Be Reallocated To A Different Workweek For The Regular Rate Calculation.**

In this case, there is no reasonable dispute as to the basic facts: (1) for rotational workweeks, the Remaining Plaintiffs were paid at their hourly rate for the first 40 hours and 1½ times their hourly rates for hours in excess of 40 and (2) for non-rotational workweeks, the Remaining Plaintiffs were paid 40 hours' of pay at their hourly rate and, if they voluntarily did field work during a non-rotational workweek, at 1½ their hourly rate for these additional hours. There is merely a legal dispute as to how the pay for non-rotational workweeks should be characterized for purposes of regular rate calculations.  Plaintiffs claim that the non-revenue pay paid for *non-rotational* workweeks to the Remaining Plaintiffs should be artificially re-allocated to their *rotational* workweeks to inflate those Remaining Plaintiffs' regular rates (and thus the overtime due to them) for those workweeks.  This argument is unavailing.

**1.      The FLSA Operates On A Workweek Basis, And Pay Received For One Workweek Does Not Affect The Regular Rate In A Different Workweek.**

**a.      Overtime Is A Weekly Calculation.**

As a threshold matter, overtime is always a <u>weekly</u> calculation. *See*, *e.g.*, 29 U.S.C. § 207(a) ("[E]mployees [must] be compensated for all hours worked in excess of forty hours <u>each</u> <u>workweek</u> at a rate not less than one and one-half times the regular rate at which he is employed.'" (emphasis added)); *see also Herman v. Fabri-Centers of Am.,* 308 F.3d 580, 589 (6th Cir. 2002) (stating "the FLSA as a whole and the DOL's implementing regulations of the Act highlight the primacy of the workweek concept"); 29 C.F.R. § 778.104 ("each workweek stands alone" for overtime purposes"); DLSE Manual § 48.1.3.1 (same); *Solano v. A Navas Party Production, Inc*., 2011 WL 98819, at *7 (S.D. Fla. January 12, 2011) (stating ""the FLSA focuses on the workweek as its basic unit").  Similarly, the "regular rate" is always a weekly calculation.

29 C.F.R. § 778.109 provides, *inter alia*, that "[t]he regular hourly rate of pay of an employee is determined by dividing his total remuneration for employment (except statutory exclusions) in any workweek by the total number of hours actually worked by him in that workweek for which such compensation was paid."  There is no statutory basis for Plaintiffs' conclusory assertion that pay associated with one workweek should be re-allocated to another simply because an employee engaged in strenuous labor in one week while in the other week he did not, and in fact such a contention runs counter to the primacy of the workweek concept.  *See, e.g., Piquniq Mgmt. Corp. v. Reeves*, 965 P.2d 732, 736-37 (1998) (applying Alaska wage and hour law and concluding that to calculate the regular rate a misclassified employee's annual salary should be divided by 52, not 26, despite the employee's working two weeks on/two weeks off schedule, because the applicable regulation required the regular rate to be figured "on a weekly basis" and noting that a different approach would lead to an "anomalous result" with "no basis in reality").  Moreover, both courts and the Department of Labor have emphasized the importance of attributing compensation—even if not pay for "hours worked"—to the workweek for which that compensation was paid.  *Crespo v. County of Monroe, New York*, No. 10-CV-6590L, 2015 WL 2406112, at *6 (W.D.N.Y. May 20, 2015) (holding that where sergeants earned roll-call stipends for attending briefings during both weeks of pay period, stipends could not be allocated only to the second week for regular rate purposes because "the fact remains, however, that an employee's regular rate must be calculated based on a normal, individual workweek"); 2008 WL 4906278, September 22, 2008 DOL Wage and Hour Opinion Letter (stating that on-call compensation, even if not pay for hours worked, "must be attributed to the workweek in which the on-call hours occurred").  For this simple reason alone, Plaintiffs' claim with respect to non-revenue pay must fail.

### b. Non-Revenue Pay Should Not Be Artificially Allocated To Scheduled Workweeks.

Despite the clear legal principle that the regular rate is always calculated on a workweek basis, Plaintiffs apparently assert that non-revenue pay for unscheduled weeks should be artificially reallocated to the Remaining Plaintiffs' rotational workweeks alleging that it must considered compensation for those workweeks instead.  However, the non-revenue payments were actually remuneration for the non-rotational workweeks, and cannot be reallocated simply because of the Remaining Plaintiffs' schedule.  Notably, the Supreme Court has concluded it is entirely permissible for an employer to hire an employee to do nothing (in this case, motivated by the specific business purpose of protecting against employee fatigue and otherwise protecting its workforce and business from competitors).  "[A]n employer, if he chooses, may hire a man to do nothing, or to do nothing but wait for something to happen."  *Armour & Co. v. Wantock*, 323 U.S. 126, 133 (1944); *see also Alvarez v. IBP Inc*., 546 U.S. 21, 26 (2005) (reiterating that in *Armour* the Court "clarified that 'exertion' was not in fact necessary for an activity to constitute 'work' under the FLSA").  As Agee explained at his deposition, "we paid them to go to sleep, to rest and get ready to come back to work and be able to do it all over again."  Ex. I (Agee 30(b)(6) Deposition), App. 150-151, at 60:9-61:16.  And notably, this arrangement was agreeable to Plaintiffs when employed by BWS.  *See* Ex. C (Fulton Dep.), App. 35, at 41:1-6 (stating that he never looked for other employment while at BWS because the two weeks off were important to him); Ex. D (Luevano Dep.), App. 52, at 22:5-9 (stating that BWS's two weeks on, two weeks off schedule was why he thought BWS could be a place he would like to work); Ex. E (Baugh Dep.), App. 67, at 12:5-9 (stating that he applied at BWS because the days off were attractive); Ex. F (Hazelhurst Dep.), App. 90-91, at 13:18-14:2 (stating that the thing that most interested him in applying to BWS was the paid two weeks off).

Critically, the evidence in this case conclusively demonstrates that BWS did not scheme to artificially spread the Remaining Plaintiffs' pay for time in the field between rotational and non-rotational workweeks.  29 C.F.R. § 778.500(a) provides that "the overtime provisions of the act cannot be avoided by setting an artificially low hourly rate upon which overtime pay is to be based and making up the additional compensation due to employees by other means."  However, the Remaining Plaintiffs' pay certainly cannot be described as "artificially low;" in fact, their hourly rates typically were above the market hourly rates, as evidenced by the pay they were making at the jobs they left to join BWS.  As set forth above,

- Plaintiff Frankie Fulton ("Fulton") was making $18.50/hour at Schlumberger, but started at $23.00/hour at BWS.

- Plaintiff Kaleb Baugh ("Baugh") was making $17.55/hour at Schlumberger, but his initial pay at BWS was $20.00/hour.

- Plaintiff Luevano was earning $20/hour at Universal Well Services, but started at $23.00/hour at BWS.

- Plaintiff Hazelhurst was earning $22/hour at Halliburton, and started at $22/hour at BWS.

- Plaintiff Castillo was earning $22.50/hour at Pumpco, and started at $23/hour at BWS.

Thus, 29 C.F.R. § 778.500 clearly is inapplicable in this case.[12]  *See, e.g., Goulas v. LaGreca*, Civ. Act. No. 12-898, 2013 WL 2477030 (E.D. La. June 7, 2013) (district court stating in conclusions of law that plaintiff's assertion that his compensation was based on an artificially

---

12 Plaintiffs may contend that an unpublished district court opinion in *Sandel v. Fairfield Industries*, C.A. No. 4:13-CV-1596, 2015 WL 7709583 (S.D. Tex. June 25, 2015) also supports their reallocation argument, but the facts in that case are clearly distinguishable.  Specifically, the *Sandel* employees, who worked a rotational schedule, used to be paid only when on rotation, but their employer then decided to pay the employees half of those wages when the employees were on rotation and half when they were off.  *Id.* at *3.  The employer claimed it did this not because the employees earned the money while off rotation, but rather to help its employees manage their money better.  *Id.* Thus, the historical background of the plaintiffs' wages in *Sandel* established that the wages which had been artificially cut in half were properly attributable to their rotational weeks.  This is fundamentally different from this case in which there was no reduction in wages and the wages paid for non-rotational weeks were paid to serve legitimate business purposes.

low regular rate failed because he had not demonstrated that his rate was artificially low for an employee with his education and experience, and pointing out that "he had actually agreed to work for a similar wage just one year before").

As a contrasting example of an actual artificially low wage for comparison purposes, in *Gagnon v. United Technisource, Inc.*, the employer paid the plaintiff $5.50 per hour for straight time and $12.50 per hour for what it called "per diem." 607 F.3d 1036, 1039 (5th Cir. 2010). The Fifth Circuit concluded that the $5.50 was an artificially low hourly rate because (1) "the Department of Labor has recognized that when…the amount of per diem varies with the amount of hours worked, the per diem payments are part of the regular rate in their entirety" and (2) "[i]t is difficult to believe that a skilled craftsman would accept a wage so close to the minimum wage when the prevailing wage for similarly skilled craftsmen was approximately three times the minimum wage." *Id.* at 1041. In contrast, in this case (1) as the Remaining Plaintiffs testified, the non-revenue pay for unscheduled weeks did not vary based on the amount of hours they worked during scheduled weeks[13] and (2) as set forth herein, the hourly rates of the Remaining Plaintiffs were equal to or more than their prior rates of pay for other similar positions. S*ee also St. Amant v. Knights' Marine and Indus. Services*, No. 14-174, 2015 WL 4568813 (S.D. Miss. July 28, 2015) (concluding that a per diem payment of $11 hourly should be included in the regular rate because it was paid for every hour the employee worked). Moreover, there were business reasons for BWS's decision to pay the field employees for unscheduled workweeks—to encourage them to rest and discourage them from taking on other employment.

In addition, any contention that BWS was seeking illegally to minimize the overtime it paid to its employees is completely illogical, in that BWS could have, but did not, legally

---

13 *See* Ex. E (Baugh Dep.), App. 82, at 44:1-13 (agreeing that regardless of number of hours he worked during scheduled time, he received 40 hours of pay for unscheduled workweeks).

minimize the overtime it paid (by, for example, structuring its workweek differently or by opting not to pay for travel time)—a overtime-maximizing practice that a number of the Plaintiffs deposed said differed from their previous or subsequent employers.[14]  In short, there is no actual or circumstantial evidence that could establish that non-revenue pay was an attempt to establish an artificially low hourly rate.

### c.  BWS And The Remaining Plaintiffs Reasonably Agreed to Treat Unscheduled Non-Revenue Pay As Hours Worked.

According to 29 C.F.R. § 778.320, in "some cases an agreement provides for compensation for hours spent in certain types of activities which would not be regarded as working time under the Act if no compensation were provided" and the "agreement of the parties to provide compensation for such hours may or may not convert them into hours worked, depending on whether or not it appears from all the pertinent facts that the parties have agreed to treat such time as hours worked."  While BWS's method of paying pressure pumping field employees for non-revenue (unscheduled) hours does not expressly fall within the examples set forth in 29 C.F.R. § 778.320, nor is it excluded.  "Where the parties have reasonably agreed to include as hours worked time devoted to activities of the type described above, payments for such hours will not have the mathematical effect of increasing or decreasing the regular rate of an employee if the hours are compensated at the same rate as other working hours."  *Id*.  In this instance, the pertinent facts establish that the parties treated non-revenue time as hours worked: the non-revenue hours were paid at the Remaining Plaintiffs' hourly rates, and if they performed field work during unscheduled workweeks they were paid for additional hours at time and one-

---

14 *See, e.g.*, Ex. F (Hazelhurst Dep.), App. 88-89, at 11:17-12:18 (testifying that his post-BWS employer moved around the workweek which resulting in his receiving less overtime pay, unlike BWS); Ex. G (Castillo Dep.), App. 112-113, at 10:17-11:16 (acknowledging that his current employer structures a two-week rotation over three workweeks which results in minimizing overtime, and agreeing that in contrast BWS had the pay and work week start on the same day).

half their regular rate.  Ex. H (Afshar Dec.), App. 137, at ¶8-9; Ex. F (Hazelhurst Dep.), App. 105, 41:17-23 (agreeing that if he worked while he was on non-revenue time he was paid at time and a half, indicating he was compensated as if he worked the non-revenue time); Ex. G (Castillo Dep.), App. 130, at 47:16-20 (agreeing that when he worked during an off week he was paid an additional time and a half for hours worked).

Therefore, non-revenue pay is non-compensable time that the parties agreed to treat as time worked, and it should not have any mathematical effect on the regular rate.

**2.      In The Alternative, Section 7(e)(2) Establishes That Non-Revenue Pay Should Not Affect The Regular Rate.**

In the alternative, 29 U.S.C. § 207(e) provides that the " 'regular rate at which an employee is employed shall be deemed to include all <u>remuneration for employment</u> paid to, or on behalf of, the employee [with certain exclusions]…."  Should the Court conclude that BWS cannot have agreed with the Remaining Plaintiffs to treat non-rotational workweeks as 40 hours worked, the next logical alternative is that the pay for those non-rotational weeks is not "remuneration for employment."  The courts have found the phrase "for employment" in Section 7(e) to be "critically important," interpreting the phrase to mean "work for which one has been hired and is being paid by the employer."  *See, e.g.*, *Plumley v. So. Container, Inc.*, 303 F.3d 364, 370 (1st Cir. 2002) (citation omitted).  This conclusion is consistent with the exclusions set forth in Section 7(e), which include:

> [p]ayments made for occasional period when no work is performed due to vacation, holiday, illness, failure of the employer to provide sufficient work, or other similar cause; reasonable payments for traveling expenses, or other similar expenses…; *and other similar payments to an employee which are not made as compensation for his hours of employment*….

29 U.S.C. § 207(e)(2).

A number of courts have held that payments made to employees that are not made to compensate for hours worked can be excluded from overtime calculation. In *Minizza v. Stone Container Corp.*, the Third Circuit explained that Section 7(e)(2)'s "other similar payments" language meant "payments not tied to hours of compensation." 842 F.2d 1456, 1461-62 (3d Cir. 1988); *see also Reich v. Interstate Brands Corp.*, 57 F.3d 574, 578 (7th Cir. 1995) (stating the term "similar [payments] then refers to other payments that do not depend at all on when or how much work is performed"). Therefore, the *Minizza* court concluded, lump sum payments made pursuant to a collective bargaining agreement were excludable because they were not compensation for hours worked. 842 F.2d at 1462. *See also Featsent v. City of Youngstown*, 70 F.3d 900, 905-06 (6th Cir. 1995) (holding bonuses paid for absence of medical claims and nonuse of sick time were excludable because they were "unrelated to the plaintiffs' compensation for services and hours of service"); *Wheeler v. Hampton Township*, 399 F.3d 238, 243-44 (3d Cir. 2005) ("employees seeking unpaid overtime may not…require that non-work pay be added to the regular rate of pay"); *Ballaris v. Wacker Siltronic Corp.*, 370 F.3d 901, 909 (9th Cir. 2004) (concluding employer's payments for lunch periods were an additional benefit and not compensation for hours worked); *Shepard v. City of Waterloo*, 14-CV-2057-LRR, 2015 WL 9165915, at *12 (N.D. Iowa Dec. 16, 2015) (where the plaintiff was compensated for 40 hours at his contracted-for hourly rate each week, but only worked 38 hours, the fact that the 39th and 40th hours were "not tied to any job duty" meant that his regular rate did not change). Similarly, should the Court conclude that the non-revenue pay was not "for employment," it is not subject to inclusion in the regular rate of pay because it was not tied to job duties.

### 3.    Summary

The non-revenue pay paid to Plaintiffs for unscheduled workweeks should not affect their regular rates of pay for scheduled workweeks for three reasons:  (1) as a threshold matter, the

non-revenue pay was not for work in rotational workweeks and should not be artificially reallocated to them, but rather should affect only the regular rate in non-rotational workweeks for which it was paid; (2) the non-revenue pay was for otherwise non-compensable time that the parties agreed to treat as hours worked, and should only affect the regular rate in the non-rotational workweeks for which it was paid; and (3) in the alternative, if the non-revenue pay was not for otherwise non-compensable time the parties agreed to treat as "hours worked," it was not "remuneration for employment" because it was not tied to hours of employment, and thus cannot be included in the regular rate of pay.   In short, BWS generously structured its compensation scheme—a scheme about which Plaintiffs never complained during their employment[15]—to include payment for rest weeks, and Plaintiffs now seek artificially to inflate their regular rate as a result of this generosity.[16] "When employer and employee have agreed upon an arrangement which has proven mutually satisfactory, we should not upset it and approve an inflexible and artificial interpretation of the Act which finds no support in its text and which as a practical matter eliminates the possibility of steady income to employees with regular hours." *Walling v. A.H. Belo Corp.*, 316 U.S. 624, 634-35 (1942).

---

15 Ex. F (Hazelhurst Dep.), App. 100, at 28:6-20 (agreeing that he knew how to raise issues to BWS but never did so, apart from his need for personal time off, and that he never though he was paid incorrectly) and App. 106, at 43:12-18 (agreeing that he didn't complain about his TIP bonus payments); Ex. G (Castillo Dep.), App. 128, at 41:4-25 (agreeing that he knew how to raise pay issues, but never complained about his pay, number of hours, or TIP bonus being incorrect).

16 To illustrate the illogical nature of Plaintiffs' theory, had BWS restricted their activities more during off-rotation weeks—by, for example, requiring them to call in every ten minutes between 9 to 5 to report they were resting—the payments for off-rotation weeks would have been for "work" and could not be added to on-rotation weeks. Essentially, Plaintiff posits that BWS should be punished for not creating fake work during these off-rotation weeks.

**C.     BWS Amended Its Pay Practices And Properly Paid Overtime Associated With The TIP Bonuses.17**

**1.     BWS Was Entitled To Change Its Bonus Plan.**

As noted above, the November 2013 version of the TIP was revised to state that "[i]f a bonus is paid, an additional payment for overtime attributable to the bonus will also be paid." Ex. O, App. 174.  This revision implemented with the TIP bonus payment for the fourth quarter of 2013, was consistent with BWS' objective that crew team members be treated equally as recognized by Remaining Plaintiffs, *see, e.g.,* Ex. C (Fulton Dep.) at App. 44, 54:2-5 (stating that he understood everyone on the same crew was to receive the same total amount), and Ex. G (Castillo Dep.), App. 120, at 30:19-2 ("each individual was going … supposed to get the same payout as everybody else on [the crew]").  With this revision, the Remaining Plaintiffs received a specific bonus payment and separate overtime payment resulting in the same total incentive payment for all crew members.

BWS had the right to make this revision.  First, while Plaintiffs' offer letters committed to paying them certain hourly rates, it made no such specific commitment with respect to the structure or amount of the TIP.  Rather, the letters only stated that "you will be eligible to participate in the Team Incentive Plan. This plan provides an incentive for achieving the client's documented expectations of Safety, and Environmental and Operational Efficiency. You must be employed at the time of payment in order to receive any bonus monies."  Exs. J-N, App. 163-172.  Moreover, the TIP document was not circulated amongst field employees, and Plaintiffs

---

17 This Motion for Partial Summary Judgment with respect to the TIP bonus claim pertains only to Q4 2013-Q2 2015 TIP bonus payments.  While BWS contends that the TIP bonus was discretionary and properly excludible from the regular rate on that basis, it acknowledges that there is a factual dispute on this point and the question of willfulness, a necessary finding for such claims to survive, thus claims related to Q1 2013-Q3 2013 TIP bonuses are not ripe for summary judgment.

testified that they were not made specific commitments regarding the TIP.[18]  *See* Ex. H (Afshar Dec.), App. 137, at ¶10; Ex. C (Fulton Dep.), App. 28, at 26:11-20 (admitting that he did not know anything about the TIP prior to his offer, and that the offer letter was the first he had heard about TIP), App. 33, at 39:5-7 (stating that he did not recall discussing the TIP when negotiating the terms of his employment), I*d.* at 39:18-21 (admitting that he did not recall if he was told the TIP was guaranteed), and App. 34, at 40:2-6 (stating that he never asked to see a copy of the TIP and that he cannot remember ever seeing it); Ex. G (Castillo Dep.), App. 120, at 30:14-19 (stating that the only conversations he had about the TIP were with co-workers).

Thus, it is clear that BWS was in no way obligated to pay the Remaining Plaintiffs any particular bonus amount or to keep the incentive structure the same.  In order to have a binding contract, the essential terms must be sufficiently certain to define the legal obligations of the parties.  *Bendalin v. Delgado*, 406 S.W.2d 897, 899 (Tex. 1966).

Moreover, even if BWS had some legal obligation to the Remaining Plaintiffs with respect to the TIP (which it did not), it was contractually entitled to change the terms or amount of the TIP because they were at-will employees.  "In employment at will situations, either party may impose modifications to the employment terms as a condition of continued employment." *Hathaway v. Gen. Mills, Inc.*, 711 S.W.2d 227, 229 (Tex. 1986); *see also Lucht's Concrete Pumping, Inc. v. Horner*, 255 P.3d 1058, 1063 and n. 3 (Colo. 2011) (en banc) (holding continued employment of an at-will employee to be sufficient consideration for a non-competition agreement he signed two years after the start of his employment); *Cellular One, Inc. v. Boyd*, 653 So.2d 30, 34 (La. Ct. App. 1995).  Generally, when an employer notifies an

---

18 *See* Ex. G (Castillo Dep.), App. 120, at 30:14-19 (stating that the only conversations he had about the TIP were with co-workers) and App. 114-115 at 17:24-18:14 (agreeing that he understood that the quarterly bonus was not guaranteed and that BWS could determine not to pay a bonus).

employee of changes in employment terms, the employee either must accept the new terms or quit. *Hathaway,* 711 S.W.2d at 229.  In this case, the Remaining Plaintiffs were apprised of the changes to the bonus plan because (1) the information regarding the fact that an additional payment for overtime attributable to the bonus would be paid was discussed with the field employees in the fall of 2013 and (2) the payments made for the fourth quarter of 2013 and after included a specific bonus amount and a separate payment for overtime associated with the bonus. *See* Ex. H (Afshar Dec.), App. 137, at ¶10-11; Ex. P (Fulton Check Stub), App. 177; Ex. Q (Baugh Check Stub), App. 180.  The Remaining Plaintiffs, by their continued employment, accepted the change to the TIP; in fact, they did not complain about their TIP payments or any of their other BWS compensation. Ex. C (Fulton Dep.), App. 36-37, at 42:20-43:21 (stating that he checked his pay stubs regularly and that any minor discrepancy he brought to BWS's attention was addressed), App. 38 at 44:7-11 (stating that he never had a situation where he thought his TIP payment was incorrect), and App. 43-44 at 53:4-54:2 (accepting TIP total payout consisting of bonus award plus overtime attributable to the bonus); Ex. F (Hazelhurst Dep.), App. 100, at 28:6-20 (agreeing that he knew how to raise issues to BWS but never did so, apart from his need for personal time off, and that he never though he was paid incorrectly) and App. 106, at 43:12-18 (received TIP payout with specific bonus payment and separate overtime payment attributable to the bonus and agreeing that he didn't complain about his TIP payout); Ex. G (Castillo Dep.), App. 128, at 41:4-25 (agreeing that he knew how to raise pay issues, but never complained about his pay, number of hours, or TIP bonus being incorrect) and App. 133, at 52:7-19 (received TIP payout with specific bonus payment and separate overtime payment attributable to the bonus in that complaint).

Finally, the FLSA did not prevent BWS from changing the TIP. First, the Department of Labor recognizes that employers may change compensation schemes; by analogy, 29 C.F.R. § 790.11 permits employers to change their policies on the compensability of pre- and post-liminary activities, noting that the Act permits "recognition of changes in customs, practices and agreements which reflect changes in labor-management relations or policies." Second, as aptly noted by the Eighth Circuit in *Abshire v. Redland Energy Services, LLC*, an "assumption that an original purpose of the FLSA was to maximize the payment of overtime rates is contrary to more contemporary authority," and "an employer's effort to reduce its payroll expense is not contrary to the FLSA's purpose." 695 F.3d 792, 796 (8th Cir. 2012). In short, there is no explicit or implicit restriction in the FLSA that would have obligated BWS to pay the same amount of bonus it had chosen to pay for prior quarters, or to somehow set its bonus at a level that would maximize overtime payments. And as instructed by *Christensen v. Harris County,* courts may not imply a prohibition that cannot be found in the Act. 529 U.S. 576, 585 (2000).

### 2. BWS Paid Overtime Associated With The TIP Bonuses.

Beginning with its fourth quarter 2013 TIP payments, BWS made separate payments paid in two separate line items to the Remaining Plaintiffs—one for bonus, and one for the increase in the overtime rate for the hours worked during the quarter—for a total desired incentive payout. As noted above, Plaintiff Fulton received:

| Earnings | rate | hours | this period | year to date |
|---|---|---|---|---|
| Bonus | | | 5,099.21 | 5,099.21 |
| Bonusovertime | | | 900.80 | 900.80 |
| Er Paid Life | | | | 6.11 |
| Non Revenue | | | | 1,880.00 |
| Gross Pay | | | $6,000.01 | 7,886.12 |

Ex. P (Fulton Check Stub), App. 177.  And Plaintiff Baugh received:

| Earnings | rate | hours | this period | year to date |
|---|---|---|---|---|
| Bonus | | | 3,380.38 | 3,380.38 |
| Bonus overtime | | | 619.70 | 619.70 |
| Regular | | | | 880.00 |
| Overtime | | | | 2,805.00 |
| Er Paid Life | | | | 5.72 |
| Non Revenue | | | | 880.00 |
| Gross Pay | | | $4,000.08 | 8,570.80 |

Ex. Q (Baugh Check Stub), App. 180.  Thus, even assuming that the TIP was non-discretionary, BWS properly calculated and paid overtime associated with the TIP payments.  *See* 29 C.F.R. § 778.209(a) (stating "[w]here a bonus payment is considered a part of the regular rate at which an employee is employed, it must be included in computing his regular hourly rate of pay and overtime compensation").

The crux of Plaintiffs' complaint appears to be that BWS was not entitled to calculate the individual bonus it would pay each Remaining Plaintiff with the goal of reaching a total target incentive (bonus plus overtime).  However, nowhere does the FLSA require that every employee receive the same bonus every quarter, nor every employee receive an identical bonus, nor does it forbid an employer from paying bonuses such that, once overtime is taken into account, a group of employees receives the same total compensation.[19]  The FLSA "does not prevent employers

---

[19] A number of cases support the somewhat analogous concept of implementing plans in which employers alter their actual compensation schemes (not discretionary bonus plans), typically by lowering base hourly rates, to ensure that they pay employees the same overall wages after complying with the FLSA's overtime requirements.  As noted by the Supreme Court in *Walling v. A.H. Belo Corp.,* "nothing in the [FLSA] bars an employer from contracting with his employees to pay them the same wages that they received previously, so long as the new rate equals or exceeds the minimum required by the [FLSA]."  316 U.S. 624, 630 (1942).  *See also Connor v. Celanese, Ltd.*, 428 F. Supp. 2d 628, 637 (S.D. Tex. 2006) (citing *Belo*, holding that an employer did not violate the FLSA by reducing the 12-hour shift wage such that annualized wages for employees would remain the same for 12-hour and 8-hour shift employees); *Parth v. Pomona Valley Hospital Medical Cntr.*, 630 F.3d 794 (9th Cir. 2010) (holding permissible an employer's reduction of certain employees' wage rates in tandem with changing their shift schedules so that those employees would continue to receive the same total wages, so long as the rate reduction was not designed to circumvent the provisions of the FLSA.  In short, the case law does not require employers to disregard the total cost associated with certain elements of compensation and/or scheduling.

and employees from contracting into whatever bonus scheme they desire." *McCormick v. Cable Communs., Inc.*, 2015 U.S. Dist. LEXIS 89133, *13 (D. Or. July 9, 2015), reversed on alternative grounds, *Brunozzi v. Cable Communs., Inc.*, 851 F.3d 990 (9th Cir. 2017).[20]

### 3.     The Overtime BWS Paid In Connection With The Bonuses Was Calculated Properly.

Furthermore, beginning with its fourth quarter 2013 TIP payments, BWS properly calculated back pay associated with TIP bonuses. Each Remaining Opt-In's quarterly regular rate increase could be determined by dividing his TIP bonus payment by all hours paid to him (including Non-Revenue Hours) over the quarter. *See* Ex. H (Afshar Dec.), App. 137, at ¶11. That regular rate increase was then multiplied by one-half and then the number of overtime hours the Remaining Opt-In worked during the quarter. *Id.* at ¶11. This method of calculation is consistent with the applicable regulation. According to 29 C.F.R. § 778.209(a), "[i]f it is impossible to allocate the bonus among the workweeks of the period in proportion to the amount of the bonus actually earned each week, some other reasonable and equitable method of allocation must be adopted."

The Remaining Plaintiffs may contend that BWS should have calculated the regular rate increased using only the number of hours they performed field work, rather than including Non-Revenue Hours in the regular rate increase calculation. However, it is reasonable and equitable to allocate an equal amount of the quarterly bonus to each hour paid during the quarter—even if the individual was not actually in the field or otherwise working during that hour—because BWS treated such time as working time for all purposes and included compensation for that time in

---

20 The Ninth Circuit did not reject the district court's statement that "[a]n important omission from the FLSA overtime provision is anything that attempts to regulate how bonuses should be calculated," but rather stated that the "production bonus" at issue in the case was not a "true bonus" because it was a portion of the regular weekly wages the employee was entitled to receive under his regular wage contract. *Brunozzi*, 851 F.3d at 996-97.

calculating the regular rate increase.  *See, e.g., Duplesse v. County of Los Angeles,* 17 F. Supp. 2d 1045, 1047 (C.D. Cal. 2010) (approving inclusion of time not actually worked in denominator where sums paid for those periods was included in the numerator for calculation of the regular rate); *Vasquez v. TWC Admin*, *LLC*, 2015 WL 2084486, at *6 (C.D. Cal. May 4, 2015) (noting the "paucity of authority bearing on this issue," but concluding that "it is permissible to include compensated non-work hours in the regular rate calculation, so long as the pay tied to those hours is also incorporated into that calculation").[21]

> **D.   No Evidence Supports The Vague "Travel Time" Claims.**

In Paragraph 22 of the Second Amended Complaint, Plaintiffs allege that BWS "failed to pay Plaintiffs…one-and-one-half times their 'travel' pay rate for all travel hours worked in excess of 40 hours per week."   However, this is untrue; as set forth above, BWS paid the Remaining Plaintiffs at their regular hourly rate for travel time, and did not have a special travel rate.   Ex. H (Afshar Dec.), App. 136, at ¶4; Ex. D (Luevano Dep.), App. 58, at 35:2-4 (acknowledging that when he traveled he was paid at regular hourly rate), Ex. E (Baugh Dep.), App. 79, at 35:12-23 (agreeing that he was paid regular hourly rate of pay for travel time), App. 80, at 36:5-9 (agreeing that if travel time was in excess of 40 hours in a workweek he was paid at time and one-half his regular hourly rate); Ex. C (Fulton Dep.), App. 39, at 46:15-18 (agreeing that he was paid for travel time over 40 hours/week at his overtime rate); Ex. F (Hazelhurst Dep.), App. 102, at 33:3-17 (agreeing that he was paid for travel time from the hotel at his hourly base rate and that if he was "on overtime" he would receive time and one-half pay for such travel time); Ex. G (Castillo Dep.), App. 126-127, at 39:7-22, 40:4-11 (agreeing he was paid for travel

---

21 Notably, the federal district court in *Vasquez* rejected the proposition that 29 C.F.R. § 778.109, which states that the "regular hourly rate of pay of an employee is determined by dividing his total remuneration for employment…in any workweek by the total number of hours actually worked by him in that workweek," prohibited including paid but unworked hours in the denominator for purposes of calculating the regular rate; it reasoned that the guidance is a "non-binding interpretive regulation that appears unlikely to have been issued with the challenged practice in mind."

to and from the motel to the job site at the same rate he got for actually working at the site), App. 131, at 48:8-22 (agreeing he was paid overtime for hours worked in excess of 40, including travel hours).  Plaintiffs have adduced no evidence demonstrating any violation, and thus this claim must fail.

> **E.      Alternatively, The Claims Of A Number Of Remaining Plaintiffs Are Indisputably Time-Barred.**

The standard two-year FLSA limitations period is extended to three years if the violation is "willful."  29 U.S.C.A. § 255(a).  While this is a high burden for Plaintiffs to meet, even assuming *arguendo* that they can prove not only BWS's liability but its willfulness, clearly the following Remaining Plaintiffs fall outside of the three-year limitations period because they terminated more than three years prior to their Opt-In Dates:

- Edgar Hernandez, Opt-In form signed 10/19/16, terminated employment 10/18/13
- Gregory Bell, Opt-In form signed 10/20/16, terminated employment 5/13/13
- Joseph Lemoine, Opt-In form signed 10/31/16, terminated employment 10/15/13
- Edgar Summers, Opt-In form signed 11/14/16, terminated employment 10/2/13

Ex. B (Clark Dec.), App. 18, at ¶4.  In addition, the following Remaining Plaintiffs moved into exempt positions which are not the subject of this litigation more than three years prior to their Opt-In Dates:

- Arnulfo Caballero, Opt-In Form signed 12/8/16, took exempt supervisor position 7/2/13
- Robert Bassler, Opt-In Form signed 12/27/16, took exempt supervisor position 8/16/13

Ex. B (Clark Dec.), App. 18, at ¶5.  Therefore, the above-referenced six Remaining Plaintiffs should be dismissed from this case.

## III.    CONCLUSION

For the foregoing reasons, Bayou respectfully respects summary judgment as to:

- Plaintiffs' claims with respect to non-revenue pay;

- Plaintiffs' claims with respect to the Q4 2013- Q2 2015 TIP bonus payments;

- Plaintiffs' claims with respect to travel pay; and

- The individual claims of Remaining Plaintiffs Hernandez, Bell, Lemoine, Summers, Caballero, and Bassler.

Respectfully submitted,

VINSON & ELKINS L.L.P.

*/s/ Douglas E. Hamel*

DOUGLAS E. HAMEL, Attorney-in-Charge
State Bar No. 08818300
VANETTA L. CHRIST
State Bar No. 24050417
1001 Fannin Street, Suite 2500
Houston, TX  77002-6760
Telephone: 713.758.2036
Facsimile:   713.615.5388
dhamel@velaw.com
lchrist@velaw.com

JOHN C. WANDER
State Bar No. 00791877
MARGARET TERWEY
State Bar No. 24087454
Trammel Crow Center
2001 Ross Ave., Suite 3700
Dallas, TX 75201
Telephone:  214.220.7918
Facsimile:  214.999.7918
jwander@velaw.com
mterwey@velaw.com

**Attorneys for Defendant,**
**BAYOU WELL SERVICES, LLC**

**CERTIFICATE OF SERVICE**

I hereby certify that on the 15th day of January 2018, a true and correct copy of the foregoing was filed electronically through the Court's CM/ECF System and was automatically copied to all parties through the Court's electronic filing system.


*/s/ Douglas E. Hamel*
Attorney for Defendant